IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NIGEL LeBLANC, *et al.*, | : | CIVIL ACTION |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DELAWARE COUNTY BOARD of | : | |
| PRISON INSPECTORS, *et al.*, | : | |
| *Defendants.* | : | No.  10-3704 |

**M E M O R A N D U M**

PRATTER, J.                                                                                                         JULY 13, 2011

**INTRODUCTION**

Nigel LeBlanc, Eugene Briggs and Zayid Bolds have sued their former employer, Community Education Centers ("CEC"), in an Amended Complaint, claiming that they were each terminated from their positions as correctional officers at the George W. Hill Correctional Facility ("the Facility") as a result of their religious beliefs, in violation of Title VII of the Civil Rights Act and 42 U.S.C. § 1983.  The Plaintiffs have also sued the Delaware County Board of Prison Inspectors ("the Board"), which is responsible for management of the Facility, and which hired CEC to provide basic services therein, under the same two statutes.

The Court dismissed the Plaintiffs' initial Title VII claims against the Board on the ground that the Complaint failed to allege facts sufficient to support the Plaintiffs' conclusory allegation that the Board qualified as their joint employer.  The Board has now moved to dismiss the Title VII claims in the Amended Complaint on the same basis, and has moved to dismiss the Plaintiffs' § 1983 claims on the ground that the Amended Complaint fails to identify any illegal policy or custom.  For the reasons set forth below, the Board's Motion to Dismiss will be denied in part and granted in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

For the purposes of a motion to dismiss, facts alleged in the Complaint are considered to be true. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-556 (2007). On that basis, the facts are as follows.

In 1996, the Board hired a firm called the GEO Group to perform a variety of basic services at the Facility. Between 2000 and 2004, the GEO Group hired each of the Plaintiffs to serve as a correction officer at the Facility. While so employed, each Plaintiff became a follower of the Rastafari movement. As adherents of the movement, the Plaintiffs, who are male, believed themselves compelled, as an article of religious faith, to stop shaving their facial hair and to wear their head hair in long dreadlocks.[1] The Plaintiffs assert, however, that they wore their long hair in neat buns on the back of their heads, and that it did not touch the collars of their uniforms.

The Plaintiffs allege that as a result of their decision to conform with this perceived religious mandate, they were subjected to "harassment" by their GEO Group superiors between September of 2006 and December of 2008. For example, Mr. LeBlanc claims that the Facility's chief of security and warden threatened him with disciplinary action if he refused to cut his hair, and that he was transferred from a preferred to a disfavored work assignment. Messrs. Briggs and Bolds also claim that they were ordered to cut their hair during this time. None of the three Plaintiffs was ever formally disciplined by the GEO Group.

On January 1, 2009, the GEO Group's management contract expired, and the Board

---

[1] A dreadlock is a "ropelike strand of hair formed by matting or braiding." Merriam Webster's Collegiate Dictionary 352 (10th ed. 1986). Followers of the Rastafari movement believe that dreadlocks are required by the Bible, citing Leviticus 21:5 and 19:27 and Numbers 6:5. *See also Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988) (summarizing Rastafari doctrine, and observing that there is no reason to doubt that the Rastafari movement is a *bona fide* religion).

replaced the GEO Group with CEC. The terms of the Board's contract with CEC were in all relevant respects identical to its contract with the GEO Group. As part of this transition, CEC took on many of the GEO Group's employees in the Facility, including the Plaintiffs.

Plaintiffs allege that the same day CEC assumed management of the Facility, an unnamed agent of CEC issued Messrs. Bolds and Briggs a one-day deadline, until Friday, January 2, to shave their beards, and a four-day deadline, until Monday, January 5, to cut their hair. On January 5, both men had shaved their beards, but neither had cut his hair. They were summoned to the office of Mario Colucci, the Facility's chief of security, a CEC employee who had worked in the same capacity under the GEO Group. Messrs. Bolds and Briggs allege that Mr. Colucci informed them that they were suspended from work until they cut their hair. Mr. LeBlanc, who had been away on vacation when the shave and cut deadlines were issued, returned to work at the Facility on January 5, and claims that he then was also told not to return to work until he had shaved his beard and cut his hair.

On January 8, 2009, the Plaintiffs met, *seriatim*, with the Facility's warden, Frank Green, an employee of CEC. Mr. Colucci, along with a CEC human resources employee named Debbie Winager, and a union representative were also present at these meetings. The Plaintiffs assert that during their meetings with Warden Green, they each explained – as indeed they claim to have done on many earlier occasions – the religious significance of their dreadlocks and beards. Nevertheless, each of the Plaintiffs was terminated from their employment, ostensibly for failing

to comply with a provision of CEC's employee handbook that requires the following of all CEC employees at secure facilities:

>   (1)   Hair shall be neatly combed and clean at all times.
>   (2)   Hair length shall not extend beyond the collar.
>   (3)   Shall be clean shaven.

The Plaintiffs concede that the Board did not pre-approve their terminations. However, they claim that this was because there was "no opportunity" for the Board to do so, and assert that the Board was "duly informed" of their terminations. They further allege that under its contract with CEC, the Board had the authority to "re-institute ... [the] accommodations" that the GEO Group had made for the Plaintiffs – referring, presumably, to the fact that the GEO Group had allowed the Plaintiffs to continue working while wearing beards and their dreadlocks in a bun. In essence, then, Plaintiffs argue that the Board "ratified" their terminations.

In their initial Complaint against CEC and the Board, the Plaintiffs asserted that both of the Defendants had discriminated against them unlawfully based on religion (Counts I and II), gender (Count III) and their race, which is African American (Count IV). CEC moved to dismiss Count III pursuant to Rule 12(b)(6), and at oral argument on that motion, the Plaintiffs stipulated to its dismissal as against each Defendant. In addition, as noted above, the Board moved successfully for the dismissal of all claims against it, on the ground that the initial Complaint failed to plead facts sufficient to show that the Board was Plaintiffs' joint employer.

Plaintiffs have since filed an Amended Complaint, which does not include a race discrimination claim. Count I asserts that both of the Defendants discriminated against the Plaintiffs based upon their faith in violation of Title VII and in violation of § 1983 by refusing to make any reasonable accommodation for the Plaintiffs' religious practice of maintaining long

dreadlocks; and Count II alleges that the Defendants violated the same statutes when it fired the Plaintiffs for refusing to cut their hair.

The Amended Complaint asserts a number of relevant facts that did not appear in the first iteration of the Complaint. These include the alleged facts that: (1) under the Board's contract with CEC, the Board and CEC "together maintained control over labor policies and discipline"; (2) under that same contract, the Board "made express contractual commitments [to] taking on (or actually, continuing) responsibility [it had held when the Facility services were provided by the GEO Group] for setting and maintaining employment policies to be followed by CEC"; and (3) "certain members of the Board, particularly [the head of the Board,] John Reilly, personally participated in the process of assessing violations of ... rules and procedures" by CEC (and previously, GEO Group) employees who worked in the Facility.[2]

The Board has moved to dismiss the Amended Complaint on the same ground that it moved for dismissal of the initial Complaint, arguing that these new factual claims should not change the Court's analysis of the joint-employer question. Indeed, the Board argues, its conduct is not even regulated by Title VII, because it does not employ the statutory minimum of 15 employees. As to the Plaintiffs' § 1983 claims, the Board argues that Plaintiffs have failed to plead an unconstitutional "policy or custom" which could potentially subject the Board, a state actor, to liability under *Monell v. New York Dep't of Social Services*, 436 U.S. 658 (1978).

---

[2] The Board denies that Mr. Reilly is an employee of the Board, and asserts that he is employed by Delaware County itself. Even if this turns out to be inconsistent with the Plaintiffs' claim that Mr. Reilly was the head of the Board, the facts alleged in the Amended Complaint are, at this stage in the litigation, assumed to be true. *Twombly*, 550 U.S. at 555-556.

**LEGAL STANDARD**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (2007) (*quoting Conley*, 355 U.S. at 47). While a complaint need not contain detailed factual allegations, the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations omitted). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level ... ." *Id.* (citations omitted).

To make such a determination, courts "must only consider those facts alleged in the complaint and accept all of those allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also Twombly*, 550 U.S. at 555-556 (courts must assume that "all the allegations in the complaint are true (even if doubtful in fact)"). The Court must also accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party. *Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989). However, the Court need not accept as true "unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Great Bay Casino Corp.,* 232 F.3d 173, 183-184 (3d Cir. 2000) (*citing City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 n.13 (3d Cir. 1998)), or plaintiff's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

**DISCUSSION**

The Court will first address the sufficiency of the Amended Complaint's factual allegations in regard to the Plaintiffs' theory that the Board was their joint employer, and then discuss whether the Board qualifies as an employer regulated by Title VII.  Finally, the Court will address the Board's argument as to § 1983.

### I. *The Board as Joint Employer*

Two entities may be considered "joint employers" for the purposes of a Title VII claim where both exercise "significant control" over the same employees. *Myers v. Garfield & Johnson Enterprises, Inc.,* 679 F.Supp.2d 598, 607 (E.D. Pa. 2010) (*citing NLRB v. Browning-Ferris Industries*, 691 F.2d 1117, 1123 (3d Cir. 1982)).  Such a situation generally arises where one entity, "while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Browning-Ferris Industries,* 691 F.2d at 1123.

The joint employer analysis is "intensely factual" in nature. *Thompson v. US Airways, Inc.*, 717 F. Supp.2d 468, 479 (E.D. Pa. 2010) (*citing Graves v. Lowery*, 117 F.3d 723, 729 (3d Cir. 1997) (applying joint-employer analysis in the Title VII context, and noting that "the precise contours of an employment relationship can only be established by a careful factual inquiry")).  Among the facts commonly considered in determining whether an entity is a joint employer are whether that entity (1) has authority to hire and fire employees, to promulgate work rules, to hand out work assignments, or to set conditions of employment (such as compensation and hours); (2) engages in day-to-day supervision of employees; or (3) controls employee records that relate to

payroll, insurance taxes, and the like. *Myers*, 679 F. Supp.2d at 607-608 (*citing Butterbaugh v. Chertoff*, 479 F.Supp.2d 485, 494 (W.D. Pa. 2007)). Each of these factors can be considered in concert with the others. None is dispositive, taken alone, and "a weak showing on one factor may be offset by a strong showing on the other two." *Id.* at 608.

Considering these factors, Plaintiffs' Amended Complaint has pled facts sufficient to demonstrate that the Board might have been the Plaintiffs' joint employer. The Plaintiffs have alleged, for example, with reference to particular provisions of the Board's contract with CEC, that the Board retained some formal authority to promulgate and enforce employment policies. They have further alleged that John Reilly, who they describe as the "head" of the Board did, in practice, "participate[ ] in the process of assessing violations of ... rules and procedures" by the employees of GEO Group and its successor CEC (each of which companies stood in essentially the same posture with regard to the Board). And finally, they have alleged, albeit generally, that although the Board did not pre-approve their termination, that it had the authority to reverse this decision after the fact. Bearing in mind that the joint employment analysis is fact-intensive, and that the record at the pleading stage is necessarily thin, Plaintiffs have cleared, however narrowly, the hurdle established by courts in this Circuit.[3]

## II. *The Board as Title VII Employer*

Title VII defines regulated employers as "person[s] engaged in an industry affecting

---

[3] *See, e.g., Myers*, 679 F. Supp. 2d at 610 (complaint sufficient as to entity's joint employer status where plaintiff alleged that entity supervised employees and had authority to promulgate and enforce work rules, but conceded that it lacked hiring and firing power); *Thompson*, 717 F. Supp. at 479 (same, where the complaint alleged that the entity controlled decisions regarding compensation and performance rules); *Braden v. County of Washington*, 2008 U.S. Dist. LEXIS 98511 (W.D. Pa., Dec. 5, 2008) (same, where more factual development was required before the court could properly address the issue of joint employment).

8

commerce who [have] fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). Although the Board has asserted, plausibly, that it has too few employees to be an considered an employer for the purposes of Title VII (indeed, that it has no employees at all), the fact that it may share joint employer status with CEC suggests that the minimum employee analysis ought to consider the number of individuals employed by both entities, taken together. *See Podsobinski v. Roizman*, 1998 U.S. Dist. LEXIS 1743 at *6-7 (E.D. Pa. Feb. 13, 1998) (where the plaintiff proceeds on a joint employer theory, "the number of employees of two or more entities may be aggregated to determine whether an employer has the requisite number of employees to trigger the protections of Title VII") (*citing Browning-Ferris Industries,* 691 F.2d at 1122). The Amended Complaint presents no specific factual allegations as to the number of individuals employed by CEC, but it pleads facts that would allow the Court to reasonably infer that it employs more than 15 people (a fact which the Board has not attempted to contest).

### III.    *Section 1983*

In *Monell*, 436 U.S. 658, the Supreme Court held that although a state actor like the Board cannot not be sued under § 1983 for an injury that has been inflicted solely by the state actor's employees or agents, it can be sued under § 1983 where one of its "policies or customs" provides the basis for the claim. Analysis of *Monell* claims often focuses on whether the plaintiff has adequately pled that the state actor in question made a "deliberate" or "conscious" decision to adopt the policy or custom to which the plaintiff objects, and whether this policy or custom was in fact the "moving force" behind any constitutional violations that may have been perpetrated by the state actor's employees. *See Canton v. Harris*, 489 U.S. 378, 389 (1989) (*citing County v.*

9

*Dodson*, 454 U.S. 312, 326 (1981); *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484 (1986)).

In this case, the Plaintiffs have failed to plead facts that might allow the Court to conclude that some deliberately-adopted Board policy was an active ingredient in the alleged failure of CEC employees to make "reasonable accommodation" for the Plaintiffs' religious practices, or for the Plaintiffs' termination. Although the Amended Complaint asserts that the Board effectively "ratified" the Plaintiffs' termination at the hands of CEC, it provides no basis to believe that the Board had any direct role in formulating the grooming policy that led to that result.[4] Although the Plaintiffs filed a response in opposition to the Board's motion to dismiss the Plaintiffs' Title VII claims, they ignored the Board's argument as to § 1983, and appear effectively to have conceded the point.

**CONCLUSION**

For the reasons set forth above, the Board's Motion to Dismiss will be denied as to the Plaintiff's claims under Title VII, and granted as to their claims under § 1983. An order to this effect follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[4] Indeed, the Plaintiffs assert that although the Board's contracts with the GEO Group and CEC were identical, the Plaintiffs were allowed under the GEO Group to grow beards and wear their hair in a bun, and were only terminated after CEC became their employer. This suggests that the proximate cause of the alleged failure to accommodate, as well as of the Plaintiffs' termination, was the change in contractors, and not any policy or custom deliberately or consciously adopted by the Board itself.